

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

JUL 1 4 2025

CLERK, U.S. DISTRICT COURT
By_____
Deputy

UNITED STATES OF AMERICA

v.

JOHN PHILLIP THOMAS (01)
LYNETTE READ SHARP (02)

No. 4:25-MJ- 479

## CRIMINAL COMPLAINT

I, Clark Wiethorn, being duly sworn, state the following is true and correct to the best of my knowledge and belief:

### COUNT 1: ACCESSORY AFTER THE FACT

On or about July 5, 2025, in the Northern District of Texas, defendants **John Phillip Thomas** and **Lynette Read Sharp**, knowing that an offense against the United States has been committed by Benjamin Hanil Song, that is, attempted murder of federal officials and a person assisting a federal official, in violation of 18 U.S.C. § 1114(a)(3), did receive, relieve, comfort, and assist Benjamin Hanil Song, in order to hinder and prevent Benjamin Hanil Song's apprehension, trial, and punishment, in violation of 18 U.S.C. § 3.

### Agent Overview

1.      I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been since December 2020. Currently, I am currently assigned to a squad in Fort Worth, Texas that is responsible for investigating terrorism cases. I am responsible for conducting investigations into various threats, including racially motivated violent extremism, militia extremism, weapons of mass destruction violations, and violent antigovernment extremists. I have received training in such areas as counter terrorism, threat management, threat assessment and violent crimes. I have worked investigations dealing with violent gangs, transportation and distribution of illegal narcotics, firearms

Criminal Complaint - Page 1 of 18

offenses, access device fraud and money laundering. I have also received training regarding computers and digital evidence. The investigations I have conducted have often involved the use of physical surveillance, cooperating witnesses, financial and telephone toll record analysis, the execution of search and arrest warrants, and the debriefing of witnesses and subjects. I also have experience in the review of evidence obtained during the execution of search warrants. Prior to joining the FBI, I was a Police Officer for the city of Grapevine, Texas for 7 years, a Uniformed Division Officer with the United States Secret Service for 2 years, and a Correctional Officer with the Texas Department of Criminal Justice for 5 years.

2.      The facts in this complaint come from my personal observations, my training and experience, and information obtained from other law enforcement officers and witnesses, and the review of records. This complaint is intended to show merely that there is sufficient probable cause that defendants **John Phillip Thomas** and **Lynette Read Sharp** committed the crime alleged and does not set forth all of my knowledge about this matter.

## PROBABLE CAUSE

### Underlying Crime

3.      Prairieland Detention Center, located at 1209 Sunflower Lane, Alvarado, Texas, was and is being used as a Department of Homeland Security ("DHS") detention facility that holds persons related to immigration violations or who are awaiting deportation hearings.

4.     Prairieland Detention Center has Correctional Officers who are contracted by DHS as officers to perform official duties on behalf of DHS.

5.     On July 4, 2025, at approximately 10:37 p.m. Central Daylight Time, a group of around ten-to-twelve individuals wearing all black began shooting fireworks towards the Prairieland Detention Center.

6.     Around 10:47 p.m., one or two individuals broke off from the main group and began to graffiti and damage vehicles and a guard structure in the parking lot at the facility, including the following:







7.      Around 10:56 p.m., the Correctional Officers called 911.

8.      Around 10:58 p.m., two unarmed Correctional Officers performing official duties for DHS at the Prairieland Detention Center came out to the fence line separating the facility from the parking lot and the woods and attempted to talk to the vandals. The Correctional Officers then exited the fence line into the parking lot and approached the vandals.

9.      Meanwhile, a person wearing a green mask can be seen standing outside the woods just north of the intersection of Tanglewood Drive and Sunflower Lane, and appeared to be signaling to the vandals with a flashlight.

10.     At the same time, around 10:59 p.m., an Alvarado Police Department ("APD") officer arrived in the parking lot at the Prairieland Detention Center in response to the 911 call by the DHS correctional officers in order to assist the DHS correctional officers in their official duties. Immediately after the APD officer got out of his vehicle, an assailant in the woods opened fire, shooting the APD officer in the neck area. The assailant in the green mask, standing near the woods on Sunflower Lane, then also opened fire at the unarmed DHS correctional officers. In total, the assailants shot

approximately 20 to 30 rounds at the DHS correctional officers. Police later recovered

spent 5.56 mm casings at the locations of both shooters. That caliber is typically used

with AR-15-style rifles.

11.     The shooting was captured on both CCTV and the APD officer's body-worn

camera.

12.     Police later found a Franklin Arms FAI-15 rifle west of the shooting on

Tanglewood Drive. The rifle had a bullet jammed in the chamber, thereby causing it to

malfunction. A second AR-15-style rifle, a Palmetto State Armory PA-15 rifle, was

found abandoned in the woods across from the Prairieland Detention Center, in the

vicinity of spent 5.56 mm casings, along with two body-armor plate carriers with loaded

AR-15 magazines. Records show that both rifles were purchased by Benjamin Hanil

Song, who has been charged in a separate complaint. A pistol magazine was also

recovered nearby.

13.     Shortly thereafter, a Johnson County Sheriff's Office ("JCSO") detective who was

enroute to Prairieland Detention Center was radioed and told that a red/maroon Hyundai

was observed fleeing the scene and that it was headed in the detective's direction. The

JCSO detective made a traffic stop on a 2007 red/maroon Hyundai van less than a mile

away, as shown below:



14.     During the traffic stop, JCSO officers observed a black pistol in plain view in the van and asked the sole occupant, identified as Bradford Morris—who has been charged in a separate complaint—if there were any other firearms in the van. Morris told the JCSO officers that there was another firearm in the backseat. At that time, the officers observed an AR-15-style rifle in the backseat of the van. Morris was removed from the van and detained. The JCSO officers also saw two Kevlar ballistic-style vests, one of which was in the backseat and the other was in the back of the van. There was also a ballistic helmet in the van. Morris had a loaded magazine in his pocket that matched the pistol, and a hand-held radio in his possession. Another AR-15-style rifle was found in the back of Morris's van. Records show that Song purchased one of these AR-15 rifles, a Palmetto State Armory PA-15.

15.     Morris admitted that he had been at the Prairieland Detention Center and claimed

that he met some people online and transported some of them down from Dallas to the Prairieland Detention Center to "make some noise." Morris claimed ownership of all the firearms in the vehicle. The JCSO officers took Morris into custody.

16.    At approximately 11:10 p.m., JCSO Deputies, responding to the Prairieland Detention Center, made contact with seven additional subjects on foot at the intersection of Tanglewood Dr. and Burnett Blvd., approximately 300 yards west of where the assailants shot the APD officer and at the DHS correctional officers. The subjects were identified as Savanna Batten, Nathan Baumann, Joy Gibson, Maricela Rueda, Seth Sikes, Elizabeth Soto, and Ines Soto, all of whom have been charged in a separate complaint. They were dressed in black, military-style clothing, some had on body armor, some were covered in mud, some were armed, and some had radios.

17.    Additional firearms, magazines containing ammunition, and a total of twelve sets of body armor were found during a search of the vehicles, persons, and area around the Prairieland Detention Center, including the following:







18.    Baumann was wet and his clothing was covered with burs, indicating that he had been crawling around in the woods. He also had a backpack that contained a can of spray paint and flyers, including the following:



Police also found, in the area where Baumann was arrested, an iPhone and an identification card belonging to Baumann.

19.     Gibson had two cell phones in her backpack inside a "Faraday bag." Based on my training and experience, I know that Faraday bags are used to block certain electromagnetic signals, including phone signals and are commonly used by criminal actors to try to prevent law enforcement from tracking location information through cell phones. Gibson also had a Derya arms pistol in her backpack, which records show had been purchased by Song in October 2024.

20.     Sikes had a handgun in his waist band, as well as an AR-15-style upper and lower receiver broken down in a backpack he was wearing. Police later determined that Song purchased the AR-15-style rifle approximately ten days prior to the shooting from a pawn shop in Grand Prairie, Texas, in Tarrant County. Sikes claimed the guns were his and claimed that they were for his own protection and that he never intended to use them.

Criminal Complaint - Page 10 of 18

21.     Evetts was the registered owner of a red 2016 Mazda CX-5 that was observed

parked at Prairieland Detention Center during and after the encounter. On July 5, 2025, at

approximately 2:00 a.m., law enforcement encountered Evetts dressed in black, military-

style clothing walking along Highway 67 near Venus, Texas, approximately three miles

from the Prairieland Detention Center. After confirming his identity and connection to

the Mazda left on scene, Evetts was arrested by the Venus Police Department ("VPD").

During a search incident to arrest, VPD officers found a black balaclava mask, a pair of

tactical-style gloves, and a pair of safety goggles. An officer asked Evetts where he was

coming from and he said, "I do not know," or words to that effect. An AR-15-style rifle

and a pistol were later found in Evetts's car.

22.     On or about July 5, 2025, pursuant to a valid search warrant, law enforcement

searched 2452 56th Street, Dallas, Texas, Morris's residence. Police recovered

approximately nine additional firearms, three body-armor vests, cans of spray paint, and

fireworks. In addition, historical cellphone location data indicates that Morris's house

was a staging location before the assailants went to the Prairieland Detention Center.

23.     At the residence was Arnold, whom a codefendant confirmed was at the

Prairieland Detention Center during the assault.

24.     On July 6, 2025, at 10:55 a.m., Rueda placed a phone call to Daniel Rolando

Sanchez, who is charged in a separate complaint. Rueda told Sanchez that her car—

which is registered to her home address in Fort Worth—was parked on the same block as

Morris's residence in Dallas. Rueda told Sanchez to tow her vehicle and that her

cellphone was located in the back of her car. She told Sanchez that her child knew the

passcode to her cellphone and to "do what you gotta do." Rueda expressed concern about the possibility of police executing a search warrant at her house, and Sanchez told Rueda that he had already gone to Rueda's house, he told her he did not believe her house had been searched, and he said that they were good. Based on the context of the conversation and other information, I believe that Rueda and Sanchez were talking about Rueda's home in Fort Worth.

25.    On July 7, 2025, at 10:49 a.m., FBI surveillance team went to a residence in Garland, Texas, which they believed was the residential address for Sanchez. FBI observed a vehicle registered to Sanchez at the residence and saw Sanchez carrying multiple packages from his residence to his truck. FBI followed Sanchez to an apartment in Denton, Texas, and saw him take what they believed was a box from his truck to the apartment. The FBI executed a search warrant on the Denton apartment and found the box carried by Sanchez. Inside the box were numerous anti-government propaganda, including the following:



26.     As described above, pursuant to traces conducted by the Bureau of Alcohol Tobacco, Firearms, and Explosives, Song purchased four of the guns that were found in connection with the Prairieland Detention Center shooting.

27.     The Franklin Armory FAI-15 abandoned at the crime scene, which Song had purchased, had a binary trigger. A binary trigger is used to "double" a regular rate of fire, allowing a shooter to fire more rapidly than a standard semiautomatic gun. I know from my training and experience that a binary trigger is typically installed after purchase from a licensed firearm dealer.

28.     On July 6, 2025, a white 2017 Mercedes Benz registered to a relative of Song was found on the same block as 2452 56th Street, Dallas, which was Morris's residence. A DFW Airport camera took a photo of an individual who I believe to be Song driving the white Mercedes on May 23, 2025, as shown below:



29.      According to information provided by a cooperating defendant, Song had travelled with Morris to Prairieland Detention Center on the night of the attack. The cooperating defendant recognized the gunfire during the attack as coming from a rifle with a binary trigger, which is consistent with the abandoned FAI-15 that Song had purchased.

30.      In addition, analysis of location data associated with Song's cellular telephone indicates the device was located within several hundred meters of the Prairieland Detention Center on July 4, 2025, beginning at approximately 11:30 p.m. (after the shooting). The phone remained in that area throughout the day on July 5. Based on this information, I believe that Song was hiding in the woods until dark the day after the shooting before fleeing the area.

## Thomas and Sharp: Accessory After the Fact

31.    On July 8, 2025, law enforcement executed a search warrant of **Thomas's** residence on Atlantic Street in Dallas, Texas. Law enforcement also interviewed **Thomas**. After initially denying he knew Song, **Thomas** later admitted he had known Song since approximately 2022 and resided with Song at the Atlantic Street residence from approximately September 2024 to late June 2025.

32.    **Thomas** stated that from July 1 through July 8, he was housesitting for a friend at a residence on Churchill Way, in Dallas, Texas. **Thomas** claimed that on July 5, the day after the shooting, he did not leave the Churchill Way residence until around 8:00 p.m., when he left to meet three individuals at the Days Inn Hotel in Cleburne, Texas. **Thomas** later admitted that they met to discuss the shooting and getting Song out of the area of Prairieland Detention Center, which **Thomas** did, picking up Song and transporting him to the Churchill Way residence.

33.    Law enforcement found in **Thomas's** vehicle a loaded 30-round AR-15 magazine and a Wal-Mart receipt dated July 6, 2025, for clothing in Song's sizes. **Thomas** later admitted to purchasing this clothing for Song.

34.    **Thomas** was also a member of at least two Signal Chat groups that also included Song as a member. In one chat, **Thomas** was the group administrator and went by the moniker: "Roy, come and get this cat." Song's moniker in this chat was "Champagne." Early in the morning on July 5, the day after the shooting, Song changed his moniker from "Champagne" to "Delete." Another user in the chat then sent a message to **Thomas**

stating, "can we get a removal here too please." After that message, **Thomas** removed Song from the group chat altogether.

35.     A similar conversation occurred in another Signal chat group involving **Thomas** and Song. Around the same time in the early morning of July 5, a different user asked "we are removing Champagne from stuff right?" Song changed his moniker from "Champagne" to "Delete" in this group chat, too, before the administrator for that group removed Song from the group chat.

36.     Law enforcement also identified certain monikers used by **Sharp** in Signal chats, including "Hippie" and "Candied Dynamite." One of the group chats from July 3 through July 4 included Song and **Sharp** (Candied Dynamite). In that chat, **Sharp** and others discussed their plans to conduct an operation at the Prairieland Detention Center, including where to meet and plan prior to the operation and nearby street addresses of Tanglewood Drive and Sunflower Lane. The chat also contained a Google satellite picture of the area, noting the location of the Prairieland Detention Center and local police departments, as shown in the image below:

37.    The chat also contained evidence that the group had performed reconnaissance at Prairieland Detention Center, including detailed descriptions of the area and photographs.

38.    **Sharp** ("Candied Dynamite") said in the group chat that she could not be at the Prairieland operation due to "family problems," but offered to monitor the chat and send money in support of the operation.

39.    In addition, on or about July 7, 2025, **Sharp** used Signal to help arrange transferring Song from **Thomas** to another person.

## CONCLUSION

40.    Based upon the foregoing facts, I submit there is probable cause to believe that

**John Phillip Thomas** and **Lynette Read Sharp** were aware of the offenses committed

against the United States by Song, namely, attempted murder of federal officials and a

person assisting a federal official, and **Thomas** and **Sharp** did assist Song in order to

hinder Song's apprehension, trial, and punishment, in violation of 18 U.S.C. § 3.

 

CLARK WIETHORN, Special Agent
FEDERAL BUREAU of INVESTIGATION

 

Sworn to me at _5:07_ a.m./p.m. in Fort Worth, Texas, on this _14TH_ day of _JULY_, 2025.

 

HAL R. RAY, JR.
UNITED STATES MAGISTRATE JUDGE